**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

PETER WIECHERS,

       **Plaintiff,**

       v.

RANDY MOORE, in his official capacity as Regional Forester for the Pacific Southwest Region of the United States Forest Service, and the UNITED STATES FOREST SERVICE,

       **Federal Defendants.**

CASE NO. 1:13-CV-00223-LJO-JLT

MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCS. 30 & 25); AND MOTION TO STRIKE (DOC. 29).

## I. <u>INTRODUCTION</u>

Plaintiff Peter Wiechers brings this challenge to implementation by the U.S. Forest Service ("Forest Service" or "Federal Defendant") of the Federal Lands Recreation Enhancement Act ("REA") fee program in the Sequoia National Forest, located in the southern Sierra Nevada in California. *See* Doc. 1, Complaint, at 2. Among other things, REA permits the Forest Service to charge users a "standard amenity recreation fee," but only at cites providing certain amenities. 16 U.S.C. § 6802(f). REA also explicitly prohibits charging fees "[s]olely for parking, undesignated parking, or picnicking along roads or trail sides." 16 U.S.C. § 6802(d). Plaintiff's first cause of action alleges the Forest Service improperly charged an amenity fee at several locations within Sequoia National Forest without providing the required amenities listed in REA in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (permitting a court to set aside final agency action that is "arbitrary,

capricious, and otherwise not in accordance with law"). Doc. 1 at ¶ 37. The second cause of action, also arising under the APA, alleges that the Forest Service improperly charged an amenity fee to enter certain sites, "regardless of whether [the visitor] use[s] the developed facilities and services." Doc. 1 at ¶ 39.

Before the court for decision are cross-motions for summary judgment on the merits of Plaintiff's claims. The parties filed a joint statement of undisputed facts. Doc. 25-1. Plaintiff filed his opening brief on October 11, 2013. Doc. 25-2. Federal Defendants filed a combined opposition and cross-motion on November 22, 2013. Doc. 30-1. Plaintiff filed a combined opposition and reply on December 18, 2013. Doc. 33. Federal Defendants filed a reply on January 14, 2014. Doc. 37. Plaintiff was granted leave to and did file a sur-reply addressing a narrow issue. Doc. 43, filed Jan. 29, 2014. Federal Defendants were, in turn, granted leave to and did file a brief response to documents attached to Plaintiff's sur-reply. Doc. 44-1, filed February 3, 2014.

To provide adequate time for the Court to review the voluminous materials submitted, the hearing on the cross-motions, originally set for hearing on February 20, 2014, was vacated. Doc. 47. Having thoroughly reviewed the papers and those portions of the extensive Administrative Record ("AR") cited by the parties, the Court believes that the issues are sufficiently developed so as to obviate the need for oral argument. The Court therefore issues the following decision based upon the papers without a hearing pursuant to Local Rule 230(g).

## II. BACKGROUND

### A.    The Federal Lands Recreation Enhancement Act ("REA").

Under the Land and Water Conservation Fund Act of 1965, Congress permitted federal land-management agencies to charge fees for recreating on federal lands when certain facilities were provided by the agency to the public. In 1996, Congress created the "Recreational Fee Demonstration Program." Pub. L. No. 104–134, § 315, 110 Stat. 1321 ("Fee Demo Program"), which required the Forest Service and three other federal land management agencies to develop a pilot program to "charge and collect fees for ... [the] use of outdoor recreation sites." *Id*. at § 315(a) & (b)(1). The stated purpose of the Fee Demo

Program was to shift more of the operational costs of public lands onto the agencies managing those lands, and also to address the need for funds to reduce an extensive maintenance backlog on public lands. *Id*. at § 315(c)(3). The Fee Demo Program provided that eighty percent of the generated revenue would be returned to the national parks, national forests, and other public lands where the fees were collected. *Id*. at § 315(c)(1)(A) & (c)(2)(A).

Response to the Fee Demo Program was not entirely positive. Prior to renewal of the Program in 2003, Representative Peter DeFazio of Oregon introduced an amendment to limit the Fee Demo to National Parks, and eliminate it on lands managed by the Forest Service and other agencies. Representative De Fazio stated:

> [There are] those of us who feel very strongly that levying these fees indiscriminately across the Forest Service and the BLM, to nondeveloped areas in particular, is of great concern. Basically, if you want to drive your car around a park and go hunting or go fishing or just walk with the kids or the dog, you have to buy a pass for nondeveloped sites, and a lot of us have strong concerns about that.

149 Cong. Rec. H7025-06 at H7033, 2003 WL 21673066 (daily ed. July 7, 2003). In response to these concerns, the chairman of the House Committee on Resources, Representative Richard Pombo of California stated:

> That is something that we are going to change. There is going to be very strict guidelines that come out of an authorization that goes to these agencies so that this does not happen in the future.
>
> I will say I oppose doing the amendment at this point in time, but I will tell the gentleman from Oregon (Mr. DeFazio) that in the future, if we cannot authorize this program and change the way that it is being run, that I would join him in eliminating the program all together, because I think people that are paying to go into these Federal lands, these public lands should be getting something for their money, and I think there is a big question as to whether or not they are, the way the program is currently being run.

*Id*. at H7034.

On December 8, 2004, Congress passed the Federal Lands Recreation Enhancement Act ("REA"). 16 U.S.C. § 6801 *et seq*. REA specifically repealed the Fee Demo Program, 16 U.S.C.

§ 6812(b) & (e)(3), and authorized the Forest Service to establish, charge, and collect recreation fees on

the National Forests in accordance with specific criteria, including the following:

> (1) The amount of the recreation fee shall be commensurate with the benefits and services provided to the visitor.
>
> (2) The Secretary shall consider the aggregate effect of recreation fees on recreation users and recreation service providers.
>
> (3) The Secretary shall consider comparable fees charged elsewhere and by other public agencies and by nearby private sector operators.
>
> (4) The Secretary shall consider the public policy or management objectives served by the recreation fee.
>
> (5) The Secretary shall obtain input from the appropriate Recreation Resource Advisory Committee, as provided in section 6803 (d) of this title.
>
> (6) The Secretary shall consider such other factors or criteria as determined appropriate by the Secretary.

16 U.S.C. § 6802(b).

REA specifically prohibits charging an entrance fee for recreational use of lands managed by the

Forest Service. 16 U.S.C. § 6802(e)(2). However, the Forest service may impose a "standard amenity

recreation fee" ("SARF") or an "expanded amenity recreation fee" ("EARF") if certain conditions are

met. A SARF may be assessed only at certain specific sites or sites providing specified amenities as

follows:

> Except as limited by subsection (d), the Secretary may charge a standard amenity recreation fee for Federal recreational lands and waters under the jurisdiction of the Bureau of Land Management, the Bureau of Reclamation, or the Forest Service, but only at the following:
>
> (1) A National Conservation Area.
>
> (2) A National Volcanic Monument.
>
> (3) A destination visitor or interpretive center that provides a broad range of interpretive services, programs, and media.
>
> (4) An area--
>
> > (A) that provides significant opportunities for outdoor recreation;
> >
> > (B) that has substantial Federal investments;
> >
> > (C) where fees can be efficiently collected; and
> >
> > (D) that contains all of the following amenities:
> >
> > > (i) Designated developed parking.
> > >
> > > (ii) A permanent toilet facility.

                      (iii) A permanent trash receptacle.

                      (iv) Interpretive sign, exhibit, or kiosk.

                      (v) Picnic tables.

                      (vi) Security services.

16 U.S.C. § 6802(f). Areas where SARFs are imposed are referred to as standard amenity fee areas ("SAFAs").

    An EARF may be imposed by the Forest Service as follows:

        Except as limited by subsection (d), the Secretary may charge an expanded amenity recreation fee, either in addition to a standard amenity fee or by itself, at Federal recreational lands and waters under the jurisdiction of the Forest Service ... but only for the following facilities or services:

        (A) Use of developed campgrounds that provide at least a majority of the following:

            (i) Tent or trailer spaces.

            (ii) Picnic tables.

            (iii) Drinking water.

            (iv) Access roads.

            (v) The collection of the fee by an employee or agent of the Federal land management agency.

            (vi) Reasonable visitor protection.

            (vii) Refuse containers.

            (viii) Toilet facilities.

            (ix) Simple devices for containing a campfire.

***

16 U.S.C. § 6802(g). Areas where EARFs are imposed are referred to as expanded amenity fee areas ("EAFA").

    Both fee provisions are subject to the limitations set forth in, 16 U.S.C. 6802(d):

        (d) Limitations on recreation fees

            (1) Prohibition on fees for certain activities or services

            The Secretary shall not charge any standard amenity recreation fee or expanded amenity recreation fee for Federal recreational lands and waters administered by the Bureau of Land Management, the Forest Service, or the Bureau of Reclamation under this chapter for any of the following:

(A) Solely for parking, undesignated parking, or picnicking along roads or trailsides.

(B) For general access unless specifically authorized under this section.

(C) For dispersed areas with low or no investment unless specifically authorized under this section.

(D) For persons who are driving through, walking through, boating through, horseback riding through, or hiking through Federal recreational lands and waters without using the facilities and services.

(E) For camping at undeveloped sites that do not provide a minimum number of facilities and services as described in subsection (g)(2)(A).

(F) For use of overlooks or scenic pullouts.

(G) For travel by private, noncommercial vehicle over any national parkway or any road or highway established as a part of the Federal-aid System, as defined in section 101 of Title 23, which is commonly used by the public as a means of travel between two places either or both of which are outside any unit or area at which recreation fees are charged under this chapter.

(H) For travel by private, noncommercial vehicle, boat, or aircraft over any road or highway, waterway, or airway to any land in which such person has any property right if such land is within any unit or area at which recreation fees are charged under this chapter.

(I) For any person who has a right of access for hunting or fishing privileges under a specific provision of law or treaty.

(J) For any person who is engaged in the conduct of official Federal, State, Tribal, or local government business.

(K) For special attention or extra services necessary to meet the needs of the disabled.

16 U.S.C.A. § 6802(d).

The House Committee Report on REA stated that these provisions were "overly prescriptive to alleviate concerns of those who no longer trust certain federal land management agencies with the recreation fee authority" by, among other things, making it clear that the Forest Service "will not be permitted to charge solely for parking, scenic pullouts, and other non-developed areas...." H.R. REP. 108-790(I), 108th Cong., 2nd Sess. 2004, 2004 WL 2920863 at *18.

6

REA requires the Forest Service to provide the public with opportunities to participate in the development of recreation fee programs established under REA's authority. *See* 16 U.S.C. §§ 6802(b)(5) & 6803(a). Among other things, REA calls for the establishment of Recreation Resource Advisory Committees ("RRAC") for each region, which "may make recommendations" to the Forest Service concerning a SAFA or EAFA under certain circumstances. 16 U.S.C. § 6803(d)(2).

In April 2005, the Forest Service issued "Federal Lands Recreation Enhancement Act (REA): Forest Service Interim Implementation Guidelines" ("Interim Implementation Guidelines" or "Guidelines") concerning the application of REA on National Forest System lands. AR 49-81. The Guidelines interpreted REA as providing authority to charge SARFs within "high impact recreation areas" ("HIRAs"), a term not defined in REA. The Guidelines defined a HIRA to mean:

> [A] clearly delineated, contiguous area with specific, tightly defined boundaries and clearly defined access points (such that visitors can easily identify the fee area boundaries on the ground or on a map/sign); that supports or sustains concentrated recreation use; and that provides opportunities for outdoor recreation that are directly associated with a natural or cultural feature, place, or activity (i.e., waterway, canyon, travel corridor, geographic attraction - the recreation attraction).

AR 70. Forests were directed to review existing recreation fee areas to determine whether those areas satisfied the additional criteria for charging a recreation fee under REA, as well as additional criteria for HIRAs set forth in the Guidelines.

Where fees are charged, the Forest Service may require visitors to display a hangtag as proof of payment. 16 U.S.C. § 6811(a)-(c). The failure to pay a recreation fee is punishable as a federal misdemeanor. *See* 16 U.S.C. § 6811(d); 36 C.F.R. § 261.17. The fine imposed for a first offense of nonpayment shall not exceed $100. *Id.*

## B.   Disputed Recreational Sites.

At issue in this case are eight developed recreation sites in the Kern River Ranger District, within the Sequoia National Forest. The Live Oak, Miracle Hot Springs, Lower Richbar, and Upper Richbar SAFA sites are located along the Lower Kern River ("Lower Kern River sites"). AR 733-36. The

Auxiliary Dam, South Fork and Old Isabella sites, as well as the Camp 9 site, are located along Lake Isabella ("Lake Isabella sites"). AR 384.

All of the recreation sites at issue in this case are located within a two-hour drive from Los Angeles and are popular weekend destinations for visitors from Los Angeles County. AR 738. They are also close to the surrounding communities of Bakersfield, Fresno, and Kern County. Kern River Valley communities use the Lake Isabella sites as a regional or community park. *Id*. According to documents in the AR, on an average summer weekend, approximately 300 to 500 people and over one hundred vehicles use the Lake Isabella sites; on an average summer holiday weekend, and during special events, use grows to 3,000 to 5,000 visitors and over 1,000 vehicles. *Id*.

In the Sequoia National Forest, visitors may pay recreation fees by several different methods, including by purchasing a daily or annual Southern Sierra Pass, by displaying the America the Beautiful National Parks and Federal Recreational Lands Pass, *see* AR 718, or by fee envelope at the Kern River sites, *see e.g.* AR 724 (showing fee envelope depository at Miracle Hot Springs). It is undisputed that recreation fees collected from these sites are used for maintenance, operations, interpretive programs and structural improvements that directly benefit recreational users. AR 587-610.

Plaintiff Peter Wiechers uses the sites at issue in this case to hike, kayak, and gain access to undeveloped portions of the Sequoia National Forest and/or access Lake Isabella. Second Declaration of Peter Wiechers, Doc. 25-3 at ¶¶ 6, 9, 15. He has paid the recreation fee(s) required to enter the sites to engage in these activities. *Id*. at ¶¶ 12-14. On June 30, 2012, while parked at the Miracle Hot Springs site to gain access to the Kern River to kayak, Plaintiff received a "Notice of Required Fee" from a Sequoia National Forest law enforcement official. *Id*. at ¶ 5 & Ex. B. On other occasions in 2013, he also purchased one of several types of day passes before visiting the disputed sites along the Kern River and at Lake Isabella. *Id*. at ¶¶ 12-14.

//

//

### III. <u>STANDARD OF DECISION</u>

Agency compliance with REA is reviewed under the APA. *See Sherer v. U.S. Forest Serv.*, 727 F. Supp. 2d 1080, 1085-87 (D. Colo. 2010) aff'd 653 F.3d 1241 (10th Cir. 2011) (applying the APA to a challenge arising under REA). Here, Plaintiff raises two claims in his Complaint. The First Claim for Relief alleges that Forest Service took actions that are arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2)(A) & (D), by charging Plaintiff and other visitors a fee to enter the sites at issue in this case without providing all six of the required amenities listed in 16 U.S.C. 6802(f)(4)(D). The Second Claim for Relief alleges that the forest service also violated the APA by charging Plaintiff a fee for entering the sites at issue in this case "to engage in recreation even though he has not used developed facilities and services, in violation of 16 U.S.C. § 6802(d)(1).

Because REA does not supply a separate standard for judicial review, the APA provides the relevant standard. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 2014 WL 975130 *9, --- F.3d --- (9th Cir. Mar. 13, 2014). Section 706(2) of the APA provides that an agency action must be upheld on review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis*, 2014 WL 975130 *9 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), abrogated in part on other grounds as recognized in *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

> Although [a court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and we may not substitute our judgment for that of the agency. [*Overton Park*, 401 U.S.] at 415–16. Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." Bear Lake Watch, Inc. v. FERC, 324 F.3d 1071, 1076 (9th Cir.2003). Even "[i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id.*

1  *San Luis*, 2014 WL 975130 *9. A plaintiff must satisfy a "high threshold" to set aside federal agency

2  actions under the APA. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010).

3  "The court's task is not to make its own judgment," because "Congress has delegated that responsibility

4  to the [agency.]" *Id*. at 1070. Instead, "[t]he Court's responsibility is narrower: to determine whether the

5  [agency's action] comports with the requirements of the APA, 5 U.S.C. § 701 *et seq*." *Id*. "The

6  [agency's] action ... need only be a reasonable, not the best or most reasonable, decision." *Id*. (quotation

7  and citations omitted).

8      Summary judgment is appropriate when the pleadings and the record demonstrate that "there is

9  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

10 Fed. R. Civ. P. 56(c). A court conducting APA judicial review may not resolve factual questions, but

11 instead determines "whether or not as a matter of law the evidence in the administrative record permitted

12 the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)

13 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir.1985)). "[I]n a case involving review

14 of a final agency action under the [APA] ... the standard set forth in Rule 56(c) does not apply because

15 of the limited role of a court in reviewing the administrative record." *Id*. at 89. In this context, summary

16 judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is

17 supported by the administrative record and otherwise consistent with the APA standard of review." *Id*. at

18 90.

19     Eastern District of California Local Rule 260(e) directs that each motion for summary judgment

20 shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific

21 material facts on which the motion is based and cite the particular portions of any document relied upon

22 to establish that fact. In APA cases, such statements are generally redundant because all relevant facts

23 are contained in the agency's administrative record. *See San Joaquin River Grp. Auth. v. Nat'l Marine

24 Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011).

25

26

# IV. <u>DISCUSSION</u>

**A.**   <u>**Motion to Strike.**</u>

Alongside his motion for summary judgment and opposition, Plaintiff filed his Second and Third Declarations and accompanying exhibits. *See* Docs. 25-3 & 33-2. The Forest Service moves to strike portions of the Second Wiechers Declaration and all of his Third Declaration. Docs. 29 and 35.

Some portions of the Second Wiechers declaration relate to Plaintiff's standing. *See, e.g., id.* at ¶ 3 ("Because I enjoy kayaking on the Lower Kern River below Lake Isabella, I have visited the recreation sites that provide access to the river many times."), ¶ 45 ("I have visited the Lower Kern River sites several times ... and I plan to return ... as early as October 12, 2013...."). The Forest Service does not object to these aspects of the Second Wiechers Declaration. Doc. 29 at 7. Material in Plaintiff's declarations going to the issue of standing will be considered.

However, the Forest Service does object that "the vast majority of the information contained in the [Second] Wiechers Declaration, as well as its accompanying exhibits, is improper factual or opinion testimony or information which the court has already determined should not be considered in this case." *Id.* at 7. The Forest Service also objects that the Third Declaration consists of extra record materials of which Plaintiff should have previously requested supplementation or materials that post-date the Forest Service's motion for summary judgment. Doc. 35 at 2.

### 1.   <u>General Standard Applicable to Supplementation of the Administrative Record.</u>

The APA limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review ... to the agency decision based on the record the agency presents to the reviewing court."). The appropriate scope of review is normally limited to "the administrative record in existence at the time of the [agency] decision and [not some new] record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (quoting *Southwest*

*Center for Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

Nevertheless, the administrative record prepared by the agency may be supplemented by extra-record materials in an APA case under four narrow exceptions:

> (1) when it needs to determine whether the agency has considered all relevant factors and has explained its decision;
>
> (2) when the agency has relied upon documents or materials not included in the record;
>
> (3) when it is necessary to explain technical terms or complex matters; and
>
> (4) when a plaintiff makes a showing of agency bad faith.

*Southwest Center*, 100 F.3d at 1450. "These limited exceptions operate to identify and plug holes in the administrative record." *Lands Council*, 395 F.3d at 1030. Yet, "[t]he scope of these exceptions permitted by [Ninth Circuit] precedent is constrained, so that the exception does not undermine the general rule." *Id*.

"There is a danger when a reviewing court goes beyond the record before the agency. When a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." *San Luis,* 2014 WL 975130, *10, --- F.3d ---. This is because agency action, including designation and certification of an administrative record, is entitled to a "presumption of regularity." *See McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739-40 (10th Cir. 1993) (while the agency "may not unilaterally determine what constitutes the administrative record" the courts "assume[ ] the agency properly designated the [AR] absent clear evidence to the contrary")). The party seeking supplementation bears the burden of overcoming this presumption by "clear evidence." *See Bar MK Ranches*, 994 F.2d at 740; *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013); *Glasser v. NMFS*, 2008 WL 114913, *1 (W.D. Wash. Jan. 10 2008).

//

//

**2.** **Plaintiff's Request to Supplement Under Any of the *Southwest Center* Exceptions is Untimely.**

The Scheduling order in this case set August 2, 2013 as the deadline for motions to supplement the AR. Doc. 13. Plaintiff filed a motion to supplement pursuant to that schedule which requested an order requiring the Forest Service to include in the AR any documentation regarding the timing of the placement of certain interpretive signs at the Lower Kern River recreation sites. Doc. 19 at 7-8. Alternatively, in the absence of information about the timing of placement, Plaintiff requested an order striking from the AR photographs of those signs. *Id*. at 8. Both of Plaintiff's requests were denied. Reasoning that Plaintiff totally failed to establish that the requested additional information falls within one of the *Southwest Center* exceptions, the Magistrate Judge refused to order the Forest Service to supplement the AR with additional information concerning the placement date of the signs. Doc. 23 at 4-6. In addition, the Magistrate Judge refused to strike the existing photographs of those signs from the record, reasoning that Plaintiff had not established they would cause any prejudice. *Id*. at 6. Plaintiff did not move for reconsideration of these rulings.

Plaintiff attempts now to invoke certain of the *Southwest Center* exceptions to resist the Forest Service's motion to strike. Plaintiff's opportunity to request consideration of documents under those exceptions has long since past, and Plaintiff offers no justification whatsoever for considering these requests out of time.[1] Therefore, any request to consider the documents in question under any of the *Southwest Center* exceptions is DENIED. This finding obviates the need to deal with many of the specific objections and responses raised in the pending motion to strike. Remaining is the question of whether any of the documents may be considered for reasons outside the *Southwest Center* exceptions.

**3.** **The Disputed Declarations and Exhibits.**

The Forest Service moves to strike the following exhibits attached to the Second Wiechers Declaration:

---

[1]       It is irrelevant that Plaintiff did not previously request consideration of these specific documents. The Scheduling Order set a deadline for motions to supplement. Plaintiff was obligated to present any documents he wanted considered by the August 2, 2013 deadline.

- Exhibit A is a photograph of the "Miracle Hot Springs Dirt Parking Lot – Kern River, California" showing what appears to be a packed earth parking lot with a "porta-pottie" prominently located near some parked vehicles. Doc. 25-3 at p. 10 of 17.[2]

- Exhibit B is an image of a Notice of Required Fee issued to a vehicle bearing the California license plate number 7Z47252 on June 30, 2012 explaining that "[a] valid recreation pass must be displayed on your vehicle at this site" and that the Notice can be remedied by sending a personal check or money order for the $10.00 recreation use fee to the Forest Service in the enclosed envelope. *Id*. at p. 11 of 17.

- Exhibit C is an image of a $10.00 Daily National Forest Southern Sierra Pass and receipt for the purchase of the same dated January 12, 2013. *Id*. at p. 12-13 of 17.

- Exhibit D is an image of a Recreation Fee Permit envelope bearing the Purchase Date of May 17, 2013. *Id*. at p. 14-16 of 17.

- Exhibit E is an image of a Southern Sierra Pass bearing the expiration date of May 29, 2013. *Id*. at p. 17 of 17.

The Forest Service objects to any references to the above documents contained within the Second Wiechers Declaration, specifically the following excerpts: ¶ 5:15 (discussing receipt of Exhibit A), ¶ 6:20 (same), ¶ 12:20 (explaining purchase of the Southern Sierra Day Pass "out of fear of punitive action"), ¶ 13:24-26 (explaining purchase "under protest" of "Recreation Fee Permit"), and ¶ 14:7 (explaining purchase, again "under protest" of Southern Sierra Pass).

The Forest Service also requests that the Court strike the following paragraphs and excerpts from the Second Wiechers Declaration:

- ¶ 20 (explaining Plaintiff's observations that there were no interpretive signs, exhibits, or kiosks at the Auxiliary Dam site on January 12, 2013);

---

[2]    The Forest Service argues that this photograph should be stricken because it duplicates photographs already found in the Administrative Record. Doc. 29 at 7. In support of this argument, the Forest Service points to a photograph of the miracle Day use "Developed Parking" which shows a different view of a packed dirt parking lot without any portable toilet or other structure. *See id*. (citing AR 657). The photographs are not identical, and Exhibit A will not be stricken on this ground.

14

- ¶ 23 (explaining Plaintiff's observations that there were no picnic tables, interpretive signs, exhibits, or kiosks at the Old Isabella site on January 12, 2013);

- ¶ 28 (explaining Plaintiff's observations that there were no toilet facilities, interpretive signs, exhibits, or kiosks at the Miracle Hot Springs site on January 12, 2013, during which time the site was closed for the season);

- ¶ 31 (explaining Plaintiff's observations that there were no interpretive signs, exhibits, or kiosks at the Upper Richbar site on January 12, 2013);

- ¶ 33 (same as to the Lower Richbar site, while acknowledging it was closed for the season at the time, January 12, 2013);

- ¶ 35 (same as to the Live Oak sign);

- ¶¶ 38-45 (discussing, among other things, Plaintiff's observations that "The Mighty Kern Provides" signs were being added to certain sites starting in April 2013, signs which Plaintiff did not observe to be present prior to that time)

- ¶ 17:19-22 (describing Plaintiff's observations that the only place he could park to access Lake Isabella or the Kern River near Camp 9 was a large day use area in the center of Camp 9);

- ¶19[3]:2-4 (explaining that at Auxiliary dam Plaintiff observed there was "no place to part at the site solely to hike down to the lake without having to pay the recreation fee at this site");

- ¶ 22:14-15 (same as to Old Isabella);

- ¶ 25:26-27 (same as to South Fork); ¶ 26:28 & 1-5 (explaining Plaintiff's observations that on January 12, 2013, there were no designated parking or interpretive signs, exhibits, or kiosks at the South Fork site);

---

[3]     The Forest Service's motion to strike appears to have a typographical error where it requests that the Court strike ¶ 18: 2-4, *see* Doc. 29 at 8, as no such excerpt exists. It appears that the Forest Service was referring to ¶ 19:2-4.

- ¶ 29:18-19 (explaining Plaintiff's observations that on May 29, 2013 the Miracle Hot

Springs site was open and the only toilet facilities present there were two "porta-potties").

### 4. **Plaintiff's Arguments For Consideration of This Evidence.**

Plaintiff makes several arguments in support of consideration of these documents and

observations. For the reasons set forth above, any such arguments that concern the *Southwest Center*

exceptions are DENIED as untimely. For example, citing predecessors to the *Southwest Center* decision,

Plaintiff argues that his Declarations should be considered as background and explanatory evidence.

Doc. 34 at 5-8. This is a clear invocation of one or more of the *Southwest Center* exceptions and will not

be considered.[4]

Plaintiff also argues that "justice requires" that his Declarations and Exhibits be considered

because excluding them would leave Plaintiff in the "untenable position of having to prove a negative,

that something did not exist – interpretive signs – at the time the Forest Service took back management

of the Lower Kern River sites from the concessionaire, at the time he was issued his Notice of Required

Fee, and at the time he was charged fees." Doc. 34 at 9. While it may be the case that Plaintiff will be

left without evidence to meet his burden of proof, the Court already permitted him an opportunity to

move to supplement the record with such evidence. He missed that deadline and offers absolutely no

basis for this Court to belatedly treat his opposition to Federal Defendant's motion to strike as a motion

to supplement the AR.[5]

---

[4]    Plaintiff's assertion that the Magistrate Judge's August 30, 2013 ruling "declined to address the difficult issue of whether plaintiff's information should have been supplemented into the record," Doc. 34 at 9, is misplaced. Plaintiff never presented any such evidence at that time, making it impossible for the Magistrate Judge to comment on whether it should be appended to the existing AR. His presentation of such evidence now is untimely. Nor is it helpful to Plaintiff's cause that he attempted to include a reference to his new evidence in the Joint Statement of Undisputed Fact. *See* Doc. 34 at 9.

[5]    Plaintiff also argues that consideration of his new evidence concerning the timing of the placement of the amenities would be "consistent with" the Magistrate Judge's previous ruling on his motion to supplement the AR. Doc. 34 at 10. Specifically, Plaintiff points to a footnote in the Magistrate Judge's ruling addressing Plaintiff's contention that the Forest Service's May 23, 2013 photographs should be stricken from the AR because they were taken after the date of the final agency decision. Doc. 23 at 6. In a footnote, the Magistrate Judge noted: "In this way, it appears that Plaintiff is seeking an order that the District Judge cannot consider [the May 23, 2013 photographs of signs] when determining whether all of the amenities were in place at the time of the agency decision. However, this is an argument to be made to the District Judge." Doc. 23 at 6 n.3. Plaintiff seems to be suggesting that because the Magistrate Judge deferred this issue until the merits phase, the Court likewise should consider his additional evidence during the merits phase. But, Plaintiff ignores the context of this footnote. In the same paragraph, the Magistrate Judge concluded Plaintiff failed to demonstrate that the May 23, 2013

Plaintiff next argues that this evidence may be considered because it goes to the issue of mootness. Doc. 34 at 2-4. As discussed below, Federal Defendants argue that many of Plaintiff's claims in this case are moot because "[e]ven assuming that at one time some of the Kern River or Lake Isabella sites lacked all the amenities required under 16 U.S.C. § 6802(f)(4)(D), the [AR] clearly demonstrates that all of the standard amenity fee recreation areas along the Kern river currently provide all six amenities ... and that the Lake Isabella sites provide all the amenities required under 16 U.S.C. § 6803(g)." Doc. 30-1 at 16.

Plaintiff is correct that, in general, a court may consider extra record evidence to determine whether a claim is moot. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560-61 (9th Cir. 2000). Plaintiff asserts generally that the disputed Declarations and Exhibits are relevant to determining whether Plaintiff is still entitled to relief in light of events that have occurred since the filling of the Complaint. Unlike with the untimely arguments rejected above, Plaintiff has an excuse for not previously raising mootness as a basis for consideration of his evidence. Mootness was not squarely presented until the Forest Service filed its motion for summary judgment.

But, Plaintiff fails to connect the actual documents and evidence presented to the mootness inquiry. Plaintiff asserts that his Declarations rebut the Forest Service's claims that the interpretive signs were in place at the Lower Kern River sites when it took over management of these sites on June 18, 2012. Doc. 34 at 3. Plaintiff misunderstands the thrust of the Forest Service's mootness argument. The Forest Service maintains that the AR establishes that all of the required amenities are <u>now</u> present at each of the Kern River sites, thereby mooting Plaintiff's claims. *See* Doc. 30-1 at 18. Nothing in Plaintiff's declarations even attempts to undermine the Forest Service's representations as to the <u>current presence</u> of certain amenities. Rather, Plaintiff's evidence disputes the <u>timing</u> of the addition of certain

---

photographs should be stricken. As an aside, the Magistrate Judge noted that when the merits issues were presented, the District Court would have an opportunity to address whether the May 23, 2013 photographs should be "considered" when evaluating whether all of the amenities were in place at the time of the agency decision. This was an acknowledgement of the distinct possibility that the District Court would find photographs taken May 23, 2013 irrelevant to the determination of whether certain amenities were in place <u>prior to that date</u>. The footnote does not suggest in any way that it would be appropriate for the District Court to consider an untimely motion to supplement the AR with further photographic evidence.

amenities at certain cites. Federal Defendant's assertion of mootness will rise or fall on the evidence in the AR, which only establishes the presence of certain amenities as of the dates of the respective photographs of those amenities: May 23, 2013. Plaintiff's assertions as to the status of those amenities prior to the dates on which the Forest Service took its own photographs are not relevant to the mootness inquiry.[6] Plaintiff cannot make an end run around the conclusion that his motion to amend is untimely by arguing that the evidence in question is presented to refute mootness when that evidence is not necessary to do so.

Relatedly, Plaintiff maintains that his Declaration and Exhibits may be used to show that the Court can still provide relief to Plaintiff. Specifically, Plaintiff maintains that this evidence establishes that "the Court can provide the Plaintiff with a specific remedy in the form of a refund or restitution in equity of moneys he should not have had to pay." Doc. 34 at 4. In making this argument, Plaintiff presumably is referring to Exhibits A-E, which document the fees Plaintiff was required to pay to utilize the disputed recreational sites. Here, Plaintiff is correct. These documents establish that he suffered an injury that, while minor, can be remedied by the Court if Plaintiff succeeds on the merits of his claims. Exhibits A through E will be considered for this purpose only.

The Court will not consider those portions of Plaintiff's motions papers that reference or rely upon the challenged materials in any other way, including those portions listed at page 8, lines 17-22 of the Forest Service's motion to strike. *See* Doc. 29 at 8:17-22.

Finally, The Forest Service also moves to strike the entirety of paragraphs 7 and 28, and paragraph 3, line 9, of the Wiechers Declaration as improper legal argument. *See* Doc. 29 at 8 (citing, *e.g.*, ¶ 28 (toilet "not what one would consider a 'permanent toilet'"); and ¶ 3, line 9 ("where the Forest Service charges a fee for parking.")). Plaintiff does not dispute that these statements are improper legal

---

[6]     Plaintiff also argues that the Forest Service's May 23, 2013 photographs showing the amenities in question "cannot technically be part of the Administrative Record" because they did not exist at the time and could not have been considered by the agency when it made the relevant decisions at issue in this case. Doc. 34 at 3. Again, any such objection is untimely. The Scheduling Order required any "objections or a motion to supplement the record" to be filed no later than August 2, 2013. Doc. 13 at 3. Plaintiff cannot now, belatedly, object to the presence of these photographs in the record.

argument. The motion to strike these excerpts is GRANTED.

**B.**     **Standing.**

Even though Plaintiff's standing is not disputed by the Forest Service, a court has a *sua sponte* duty to examine standing in every case. *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002). Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir.2001). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1983). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984), abrogated on other grounds, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 2014 WL 1168967, --- S. Ct. --- (Mar. 25, 2014). "The court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149 155–56 (1990); *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002). Standing requires three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted).

In addition to the constitutional requirements of Article III, courts have developed a set of prudential considerations to limit standing in federal court to prevent a plaintiff "from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances' pervasively

shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, (1982) (quoting *Warth*, 422 U.S. at 499–500). To that end, "the plaintiff's complaint must fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge,* 454 U.S. at 475 (quoting *Ass'n of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). In cases arising under the APA, this requirement is particularly important given the limitations of 5 U.S.C. § 702, which "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.' " *Association of Data Processing Serv. Orgs.*, 397 U.S. at 153–54 (citing § 702).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lujan*, .

### 1.   **Injury in Fact.**

The first element of Article III standing is injury-in-fact, which *Lujan* defines as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural or hypothetical.' " 504 U.S. at 560 (internal citations omitted). Here, Plaintiff has already been injured by the Forest Service's issuance of a "Notice of Required Fee," as well as having to pay fees for recreating at the various sites along Lake Isabella and the Lower Kern River where he asserts those fees are illegal. Second Wiechers Decl., Doc. 25-3, at ¶¶ 6-7, 12-14. Mr. Wiechers will also suffer

20

injuries in the future if Defendants are allowed to continue charging him a fee solely to park for hiking or access to the lake or river when he does not plan to use the amenities, as he plans to return to those on certain future dates and for the rest of his life. *Id.* ¶¶ 9-11, 18, 21, 24, 46; *see Sequoia ForestKeeper v. Tidwell*, 847 F. Supp. 2d 1217, 1231 (E.D. Cal. 2012) ("[A] declarant who intends to establish imminent future injury must also specify when that declarant intends to return to visit the site of the specific Forest Service project.").

The second standing requirement, causation, requires that the injury be "fairly traceable" to the challenged action of the defendant, and not be "the result of the independent action of some third party not before the court." *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000). The causation element is lacking where an "injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003). For the purposes of determining standing, while the causal connection cannot "be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be so airtight ... as to demonstrate that the plaintiffs would succeed on the merits.' " *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005). Here, there can be no dispute that Plaintiff's claimed injuries were or will be caused by the challenged implementation of REA by the Forest Service at the disputed recreational sites.

Standing also requires that the injury likely can be redressed by a favorable court decision. *Lujan*, 504 U.S. at 561. Plaintiffs seek reimbursement of the fees he paid as well as declaratory relief. A favorable decision from the Court providing Plaintiff's requested relief of a refund of his fees paid and/or declaratory relief will redress his injuries.

Finally, Plaintiff's APA "complaint must fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Service Orgs.*, 397 U.S. at 153). The interest asserted by the plaintiff must bear a plausible relationship to the policy underlying the statute. *Natural Res. Defense Council v. Patterson*, 791 F. Supp. 1425, 1429–30 (E.D. Cal. 1992).

> [T]he source of the plaintiff's claim to relief assumes critical importance
> with respect to the prudential rules of standing that, apart from Art. III's
> minimum requirements, serve to limit the role of the courts in resolving
> public disputes. Essentially, the standing question in such cases is whether
> the constitutional or statutory provision on which the claim rests properly
> can be understood as granting persons in the plaintiff's position a right to
> judicial relief....

*Warth*, 422 U.S. at 500.

Again, there can be no question that the statutory provision at issue in this case, REA, properly

can be understood as granting persons in Plaintiff's position a right to judicial relief. The statute was, at

least in part, designed to limit the Forest Service's ability to charge fees of recreational users. *See* H.R.

REP. 108-790(I), 108th Cong., 2nd Sess. 2004, 2004 WL 2920863 at *18 (House Committee Report

stating that REA's provisions were "overly prescriptive to alleviate concerns of those who no longer

trust certain federal land management agencies with the recreation fee authority" by, among other

things, making it clear that the Forest Service "will not per permitted to charge solely for parking, scenic

pullouts, and other non-developed areas....").

In a general sense, Plaintiff has standing to pursue his claims. As discussed below, however, he

lacks standing to pursue one aspect of his challenge to the provision of required amenities at the specific

SAFA sites. Standing is evaluated on a claim by claim basis. *Get Outdoors II, LLC v. City of San Diego,*

*Cal.*, 506 F.3d 886, 893 (9th Cir. 2007).

## C.    Mootness.

The Forest Service argues that to the extent Plaintiff's claims are based upon the failure to

provide all of the required amenities at particular sites, Plaintiff's claims are moot. Doc. 30-1 at 16-18.

Even assuming that at one time some of the sites lacked all of the required amenities, the Forest Service

maintains that the AR demonstrates that all of the required amenities are currently present at those sites.

Doc. 30-1 at 16.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of

Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable

22

interest in the outcome.' " *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citations and quotations omitted). If the parties cannot obtain any effective relief, any opinion about the legality of a challenged action is advisory. *Id.* "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997) (internal citation and quotation omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 67. Even if a case is technically moot, a case may nevertheless be judiciable if one of three exceptions to the mootness doctrine applies: (1) where a plaintiff "would suffer collateral legal consequences if the actions being appealed were allowed to stand"; (2) where defendant voluntarily ceased the challenged practice; and (3) for "wrongs capable of repetition yet evading review." *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 964–66 (9th Cir. 2007). "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Palmdale Hills Property, LLC*, 654 F.3d 868, 874 (9th Cir. 2011).

First, the question of mootness is simply not applicable to some of Plaintiff's claims. Plaintiff claims that the port-a-potties currently present at the Miracle site do not qualify as "permanent toilet facilities." Doc. 25-2 at 15-16; AR 653 (showing port-a-potties present as of May 23, 2013). Thus, Plaintiff's claims as to Miracle are not moot. Plaintiff also claims that the signs currently present at the Lower Kern River sites do not qualify as "interpretive signs" under the Guidelines and raises certain arguments regarding those signs that are not impacted by the Forest Service's recent upgrades to those signs. Doc. 25-2 at 19-20; *compare* AR720-21 *with* AR722 (Live Oak signage); AR723-24 *with* AR725-

26 (Miracle signage); AR727-28 *with* AR729 (Lower Richbar signage); AR730-31 *with* AR732 (Upper

Richbar signage). Likewise, Plaintiff raises a generic challenge to the Forest Service's practice of

charging fees to users who do not use the developed amenities. Doc. 25-2 at 23-25.

As to Plaintiff's other claims, Plaintiff maintains that the Court can nevertheless afford him relief

because he paid fees. The APA waives a federal agency's sovereign immunity only with respect to

claims for <u>equitable</u> relief. Section 702 of the APA, 5 U.S.C. § 702, waives sovereign immunity over

claims for equitable relief based on agency action. Section 702 of the APA provides:

> A person suffering legal wrong because of agency action, or adversely
> affected or aggrieved by agency action within the meaning of a relevant
> statute, is entitled to judicial relief thereof. An action in a court of the
> United States seeking relief <u>other than money damages</u> and stating a claim
> that an agency or an officer or employee thereof acted or failed to act in an
> official capacity or under color of legal authority shall not be dismissed
> nor relief therein be denied on the ground that it is against the United
> States or that the United States is an indispensible party. The United States
> may be named as a defendant in any such action, and a judgment or decree
> may be entered against the United States.

5 U.S.C. § 702 (emphasis added). Here, among other things, Plaintiff is requesting a refund of the fees

he paid to access the recreational sites. Specific relief in the form of restitution of fees paid is an

equitable remedy available against an agency under the APA. *See Harger v. Dep't of Labor*, 569 F.3d

898, 905 (9th Cir. 2009); *America's Community Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000)

(plaintiff's action seeking refund of fee overpayment pursuant to statute is specific relief, not damages,

within the scope of 5 U.S.C. § 702*); see also Adams v. U.S. Forest Service*, No. CV 08-283-TUC-RCC,

Slip. Op., Dkt. #34 at 4 (D. Ariz. March 9, 2010) (attached to the Second Declaration of René Voss,

Doc. 33-1, as Exhibit A) (finding jurisdiction under APA to adjudicate request for restitution of REA

fees paid by recreational users). Thus, by providing the Plaintiff with the available equitable relief of a

refund of fees he paid, the Court can provide effective relief even if the Forest Service has corrected

some or all of the alleged violations. Federal Defendant's motion for summary judgment that certain of

Plaintiff's claims are moot is DENIED.

Because the Court finds that Plaintiff's claims are not moot because the Court can provide

24

effective relief, the Court declines to address Plaintiff's alternative objections to a mootness finding, including his invocation of the voluntary cessation exception to the mootness doctrine.

**D.      REA Compliance at the Eight Sites.**

**1.      Kern River Sites (Live Oak, Miracle Hot Springs, Lower Richbar, Upper Richbar).**

The Sequoia National Forest took over management of the Live Oak, Miracle Hot Springs, Lower Richbar, and Upper Richbar sites from a concessioner, and, on June 18, 2012, designated these four sites as SAFAs. AR 433. The Upper Richbar site is open year-round. AR 736. The other three sites are open from May to September. AR 733-35.

**a.      Port-a-Potties at Miracle Hotsprings.**

REA explicitly requires any SAFA to contain a "permanent toilet facility." 16 U.S.C. § 6802(f)(4)(D)(ii). Plaintiff argues that the Miracle Hot Springs ("Miracle") site lacks a permanent toilet facility and therefore that the Forest Service is violating REA by charging a SARF to access that site. Doc. 25-2 at 15-17. It is undisputed that the only bathroom facilities provided at the Miracle site are portable bathrooms made of plastic or fiberglass (i.e. "port-a-potties"). AR 653 (image of toilet facilities at Miracle Day Use Area). The Forest Service removes these port-a-potties when the site is closed for the winter to prevent vandalism and weather damage. Doc. 30-1 (citing AR 735).

The Forest Service maintains that port-a-potties qualify as "permanent toilet facilities" under REA. Doc. 30-1 at 10-12. In support of this assertion, the Forest Service relies on its Guidelines, which defines "permanent toilet facility" as "[a] toilet building with a floor, walls, and roof that is permanently affixed or that is available (year after year) in locations that serve visitors during the primary use season but are moved during the non-use season because of environmental or weather concerns." AR 70.

It is undisputed that the Guidelines were never subjected to notice and comment rulemaking. While a noticed rule would be entitled to substantial *Chevron* deference, the Guidelines are entitled to more limited deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations contained in policy statements, agency

25

manuals, enforcement guidelines, all of which lack the force of law -- do not warrant *Chevron*-style

deference."); *Adams v. U.S. Forest Serv.*, 671 F.3d 1138 (9th Cir. 2012) (appearing to approve of district

court's application of *Skidmore* to the Guidelines). Under *Skidmore*, agency interpretations are "entitled

to respect," but only to the extent that those interpretations have the "power to persuade." *Christensen*,

529 U.S. at 587.

Here, whether or not the Forest Service's interpretation of the statutory language "permanent

toilet facility" is persuasive is a question of statutory interpretation. When terms used in a statute are

undefined, a court must give them "their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S.

179, 187 (1995); *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1264 (2011)("Statutory construction must

begin with the language employed by Congress and the assumption that the ordinary meaning of that

language accurately expresses the legislative purpose")(citation omitted). Websters offers several

definitions of permanent:

> lasting or continuing for a very long time or forever: not temporary or
> changing; continuing or enduring without fundamental or marked change:
> stable.

http://www.merriam-webster.com/dictionary/permanent (last visited February 27, 2014). The Forest

Service maintains that its interpretation of the term "permanent toilet facility" comports with this

definition. Doc. 30-1 at 11. The Forest Service does argue that "the Agency removes the toilet when the

site is gated and closed for the winter," during which times fees are not charged. Doc. 30-1 at 12. This

entirely misses the point. Although the Forest Service may have good reasons why it might not want to

leave a restroom facility in a particular area year round (e.g., to prevent vandalism or weather damage),

the Court is at a total loss as to how a port-a-potty that is admittedly only present at a site part of the year

could ever qualify as a "permanent toilet facility." The Forest Service's practice with respect to the

provision of toilet facilities at Miracle is not aligned with the concept of permanence, as the toilets they

provide there do not "continue or endure without fundamental or marked change." Just because users

can predict that the port-a-potty will be there during Miracle's open season does not transform the port-

a-potty into a permanent toilet facility.

Moreover, the Forest Service's interpretation would render the term "permanent" totally superfluous in the statutory language. If all Congress wanted to require was a "toilet facility" it could have said so and fees could only be charged when a "toilet facility" is present at the site. This is, in effect, what the Forest Service does at Miracle, charging fees when the port-a-potty is present, but not when it has been removed. The only plausible explanation for Congress' addition of the term "permanent" to the statute was that Congress wanted the public to have access to a more permanent (and presumably higher quality) toilet facility at Forest Service sites where fees were charged.[7]

The Forest Service's definition of the term "permanent toilet facility" to include port-a-potties, even if they are predictably present at a site during its open season, is simply not persuasive and is therefore not entitled to *Skidmore* deference.

Plaintiff's motion for summary judgment that the Miracle site does not meet the requirements of the REA to charge a SARF is GRANTED; Federal Defendant's cross motion is DENIED.

### b.       Interpretive Signs at the Kern River Sites.

REA also requires any SAFA to display an "interpretive sign, exhibit, or kiosk." 16 U.S.C. § 6802(g). The Guidelines provide the following definition:

> Interpretive Sign, Exhibit or Kiosk – Each site or area must contain at least one public display designed to develop a visitor's interest, enjoyment, and understanding of the natural or cultural environment. This requirement is in addition to facilities needed to inform visitors of recreation opportunities, facilities, and applicable regulations and restrictions. Messages should be relevant to the setting and the visitor – generic posters and safety information are not adequate. The design, content, and medium should be of professional quality. The information may be incorporated into a bulletin board or presented through other signing or media. In general, single displays should be a minimum of roughly 25 x 30 inches.

---

[7]       The Court is not persuaded by the Forest Service's argument that "[n]othing in REA requires that once an amenity is provided, the Agency must continue to provide it in perpetuity." Doc. 30-1 at 12. This may be true, but it begs the question of whether the amenity has ever been provided accordance with legislative command. Here, a port-a-potty simply cannot satisfy any reasonable interpretation of the statutory language "permanent toilet facility."

Nor is the Court persuaded by the fact that Congress did not specifically require "flush" toilets at SAFAs. AR 70. The Forest Service offers the Court no basis upon which to conclude it would be impossible to provide a non-flush permanent toilet facility.

Consideration should be given to bilingual and accessibility needs.

AR 70. Plaintiff does not argue that this definition is unlawful or otherwise inappropriate. Rather, he argues (1) that no interpretive amenities were provided when the Lower Kern River sites were designated as SAFAs on June 19, 2012, and (2) that that the signs that were eventually placed at the Lower Kern River sites do not comply with the Guidelines. Doc. 25 -2 at 17-19.

### (1) Were Interpretive Amenities Present When the Lower Kern River Sites Were Designated?

Plaintiff argues that the record is devoid of evidence demonstrating that interpretive amenities were available at any of the Lower Kern River sites at the time they were designated SAFAs. Doc. 25-2 at 17-19. Plaintiff acknowledges that the AR contains several photographs of signs at each of the four Lower Kern River SAFAs taken May 23, 2013. AR 652, 647, 643, 676. Plaintiff maintains, however, that the AR is devoid of evidence demonstrating when those signs were placed and, in particular, of any evidence indicating that the interpretive signs were in place when he received his Notice of Required Fee on June 30, 2012. *See* Doc. 25-2 at 17-18.

Plaintiff bears the burden of demonstrating the agency's action is arbitrary and capricious. *See George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009) (quoting *City of Olmsted Falls, Ohio v. FAA,* 292 F.3d 261, 271 (D.C. Cir. 2002). A Court must be "highly deferential" in an APA review case, and must "presum[e] the agency action to be valid ...." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).[8] Plaintiff appears to acknowledge as much, asserting that he has provided such evidence, in the form of the extra-record declaration discussed above. *See* Doc. 33 at 5. Yet, Plaintiff failed to timely petition for its consideration. Absent proof to the contrary, it must be presumed that the signs were in place at the time the Lower Kern River sites were designated and at the time Plaintiff received his Notice of Required Fee. Therefore, Plaintiff's motion

---

[8]     Plaintiff's invocation of the substantial evidence standard, *see* Doc. 33 at 6-7 (citing *Love Korean Church v. Chertoff*, 549 F.3d 749, 754 (9th Cir, 2008), is misplaced. That standard applies only when an agency is charged with making formal factual findings pursuant to 5 U.S.C. §§ 556 or 557 or "otherwise reviewed on the record of an agency hearing provided by statute." *See* 5 U.S.C. § 706(2)(E).

28

for summary judgment that the forest service failed to demonstrate the presence of interpretive amenities at the Lower Kern River sites when they were designated SAFAs is DENIED for lack of proof; Federal Defendant's cross motion is GRANTED.

### (2)   Do the "Mighty Kern Provides" Signs Shown in the Forest Service Photographs Comply with the Guidelines?

Next, Plaintiff argues that the signs shown in the May 2013 photographs do not comply with the Guidelines' requirements for interpretive signs. The images in the AR show laminated copies of a poster stapled to existing bulletin boards. AR 643, 647, 652, 676. The Guidelines define an "interpretive, sign, exhibit or kiosk," as follows:

> Each site or area must contain at least one public display designed to develop a visitor's interest, enjoyment, and understanding of the natural or cultural environment. This requirement is in addition to facilities needed to inform visitors of recreation opportunities, facilities, and applicable regulations and restrictions. Messages should be relevant to the setting and the visitor – [G]eneric posters and safety information are not adequate. The design, content, and medium should be of professional quality. The information may be incorporated into a bulletin board or presented through other signing or media. In general, single displays should be a minimum of roughly 25 x 30 inches. Consideration should be given to bilingual and accessibility needs.

AR 70.

First, Plaintiff maintains that the signs are "generic," in that the same sign is used at all four sites. Doc. 25-2 at 19. The Forest Service maintains that a sign is not "generic," even if it is used at more than one site, if it is specific to the sites in question. Doc. 30-1 at 13. For example, the "Mighty Kern Provides" signs, which are found at all of the Lower Kern River sites, specifically display information about the Kern River. AR 643, AR 722 (Live Oak); AR 647, AR 729 (Lower Richbar); AR 652, AR 725-26 (Miracle); AR 676, AR 732 (Upper Richbar). Presumably, such signs would be distinguishable from a hypothetical sign that discusses some general feature of nature not specific to the particular site in question. The Forest Service's interpretation of its own Guidelines does not run contrary to any statutory instruction and has the "power to persuade," which is sufficient under *Skidmore*. *See Christensen*, 529 U.S. at 587. Plaintiff's motion for summary judgment as to this ground for relief is

29

1  DENIED.

2      Second, Plaintiff argues that the signs are not presented in a "professional medium." *See* AR

3  720-21, 723-24, 727-28, 730-31 (showing signs in context posted on upright bulletin boards). The Forest

4  Service responds in two ways to this argument. First, the Forest Service maintains that Plaintiff is

5  relying on outdated information, pointing to new versions of the signs, which are "clearly" of

6  "professional quality." It is true that the AR contains images of upgraded signs, more formally mounted

7  onto boulders at the fee sites. *Compare* AR720-21 *with* AR722 (Live Oak signage); AR723-24 *with*

8  AR725-26 (Miracle signage); AR727-28 *with* AR729 (Lower Richbar signage); AR730-31 *with* AR732

9  (Upper Richbar signage). But, the Forest Service does not even contend that Plaintiff was required to

10 pay a fee to access those sites at a time when the newer versions of the signs were in place. The

11 upgrades are therefore irrelevant to the inquiry.[9]

12     The Forest Service also maintains that the original, laminated signs were presented in a

13 "professional" manner. The images of those signs reveal that they were laminated and incorporated into

14 a bulletin board. Again, although the placement and design of these signs certainly could be more

15 impressive, this Court cannot definitively say they are not of "professional quality." In fact, the

16 Guidelines themselves acknowledge that the "information may be incorporated into a bulletin board or

17 presented through other signing or media."[10]

18     Additionally, Plaintiff argues that the signs do not qualify under the Guidelines because they are

19 not bilingual and do not meet accessibility needs because of their location on the backs of existing

20 bulleting boards where the viewer must step off the payment, over a curb, and behind the panel to view

21 the sign. *See* AR 720-21, 723-24, 727-28, 730-31 (showing signs in context). However, neither the REA

22 nor the Guidelines require the signs to be bilingual or accessible. The Guidelines merely state that

23 _____

24 [9]      Likewise, that the Forest Service upgraded the signs is not proof that they were previously inadequate. Plaintiff has
presented no authority suggesting that an agency may not upgrade facilities without impliedly admitting that prior facilities
25 were insufficient.
[10]      That the Forest Service has recently upgraded the Guidelines' definition of "Interpretive Sign, Exhibit or Kiosk" is
not relevant to this Court's review of the agency's compliance with the Guidelines in force at the time the original signs were
26 placed.

"consideration should be given to bilingual and accessibility needs." AR 70.

Plaintiff's motion for summary judgment that the Forest Service failed to provide interpretive amenities at the Lower Kern River sites is **DENIED**.

### 2.   Camp 9.

Plaintiff's motions papers do not argue that the required amenities are not present at Camp 9. Therefore, Federal Defendant's cross motion for summary judgment that Plaintiff's claims regarding Camp 9 are unsupported is **GRANTED**.

### 3.   Lake Isabella SAFA.

On July 16, 2008, the Forest Service approved fee increases for day and overnight use at the Lake Isabella SAFA. AR 421; AR 423. Plaintiff maintains that this action violated REA, because, at the time the fee increase was approved, the Forest Service failed to provide the required amenities, namely: designated developed parking; a permanent toilet facility; a permanent trash receptacle; an interpretive sign, exhibit, or kiosk; picnic tables; and security services. Doc. 25-2 at 21; 16 U.S.C. § 6802(f). Plaintiff points to a June 1, 2008 "Revised Business Plan for the Lake Isabella High Impact Recreation Area," which includes a statement of "Amenities Provided" at Auxiliary Dam, Old Isabella, and South Fork, which only mentions the presence of "flush toilets," "picnic tables," "trash collection [and] ... dumpsters." AR 394-95. There is no mention of any interpretive amenities. *Id*. The absence of interpretive amenities at that time was acknowledged by the Forest Service when it responded to the 2011 REA review by stating that such amenities were not present, but that the Forest Service "plan[ned] to install a 3rd panel at the existing visitor information station in 2011." AR 454.

The Forest Service responds by asserting that the Lake Isabella SAFA was re-designated into three separate EAFAs (Old Isabella, Auxiliary Dam, and South Fork) in 2012. *See* AR499-500, 507, 510 (July 2012 memo specifically discussing immediate implementation of re-designation of Lake Isabella SAFA into three EAFAs). Unlike SAFAs, which require the presence of all of the six amenities listed

1    above, an EAFA requires the presence of "a majority" of the amenities listed in 16 U.S.C. § 1608(g).[11]

2    There is no dispute that all three sites currently meet, and have met since 2012, the requirements for

3    EAFAs.

4          Plaintiff points out that the re-designation was not formally approved by the RRAC until

5    September 13, 2013. AR 767-68. Plaintiff maintains that, until the formal approval, the Forest Service

6    was required to have all six amenities required of a SAFA in order to charge fees there, and that because

7    the Forest Service has admitted no interpretive amenities existed within the Lake Isabella SAFA, the

8    Forest Service could not lawfully charge fees within that area prior to September 13, 2013. Doc. 25-2 at

9    22.

10         It is somewhat unclear, however, whether the Forest Service claims that the re-designation of the

11   Lake Isabella SAFA into the three EAFAs is fatal to Plaintiff's claims on the merits because the

12   conversion took place before his claimed injury, or whether that the re-designation moots Plaintiff's

13   claims. In fact, the Forest Service's brief appears to make both arguments. *See* Doc. 30-1 at 14-15, 17-

14   18. The timing of the relevant events is not clearly articulated in the briefs but is critical to the Court's

15   analysis.

16         A close examination of the AR reveals that the Forest Service received approval from the

17   Washington Office for its proposal to eliminate the Lake Isabella SAFA and convert it to three stand-

18   alone EAFAa in January of 2012. AR 492-96. But, this general approval, applicable to numerous

19   proposals, acknowledged that some proposals might not be implemented as proposed because "[t]he

20   next step in the ... process is public involvement." AR 495.[12] Subsequent guidance from the Washington

21   Office, issued May 16, 2012 by the Deputy Chief of the national Forest System, directed Regional

22   Foresters as follows:

23   _____

24   [11]    16 U.S.C. § 6802(g) provides an EAFA must "provide at least a majority of the following: (i) Tent or trailer
         spaces[;] (ii) Picnic tables[;] (iii) Drinking water[;] (iv) Access roads[;] (v) The collection of the fee by an employee or agent
         of the Federal land management agency[;] (vi) Reasonable visitor protection[;] (vii) Refuse containers[;] (viii) Toilet

25   facilities[;] (ix) Simple devices for containing a campfire."
     [12]    The Court finds this general acknowledgement of the applicability of the public involvement process not to be in

26   conflict with the Forest Service's later, far more specific finding that certain types of re-designations need not undergo pre-
         approval by an RRAC.

On March 25, 2011, I issued guidance for reviewing our 97 large standard amenity recreation fee areas with multiple recreation sites or complexes. That guidance resulted in proposals to remove the large area designation from 73 of these areas and reduce most of the remaining 24 areas, which were concurred with in letters from my office in December, 2011 and February, 2012. As a result, many lower developed recreation sites are proposed for elimination from the recreation fee program. This is a significant change to our recreation fee program, one that puts us on sound footing for future success, and I want to applaud you for your hard work and diligence.

I recognize that public participation, including Recreation Resource Advisory Committee (RAC) review, is required by the Federal Lands Recreation Enhancement Act (REA) to implement these proposals. However, it is important that we demonstrate commitment to this approach.

To that end, I am directing that you not enforce standard amenity recreation fees or issue notices of required fees for any portion of a large area that has been proposed for elimination from the recreation fee program. If a large area is being divided into smaller areas with a single recreation site or tight cluster of sites, ensure that all these sites contain all the required amenities and services before continuing to enforce fees or issue notices of required fees at those sites. Sites may include some designated overflow parking areas if they are key to the function and use of the site.

You may convert a standard amenity recreation fee for an area to another type of recreation fee, such as an expanded amenity recreation fee or special recreation permit fee, provided there is no change in the fee amount and the criteria for charging that type of fee under REA and the Forest Service's Interim Implementation Guidelines on REA are met.

AR 499-500, AR 507 (emphasis added).

More specifically, a May 11, 2012 document provided "Guidance for Standard Amenity Fee Areas Proposed to be Changed Pending Public Input":

1) Do not enforce standard amenity recreation fees or issue notices of required fees for any portion of an area that has been proposed for elimination from the recreation fee program.

2) If an area is being divided into smaller areas with a single recreation site or tight clusters of sites, ensure that all these sites contain all the required amenities and services before continuing to enforce fees or issue notices of required fees at those sites. Sites may include some designated overflow parking areas if they are key to the function and use of the site.

3) You may convert a standard amenity recreation fee for an area to

33

another type of recreation fee, such as an expanded amenity recreation fee or special recreation permit fee, provided there is no change in the fee amount and the criteria for charging that type of fee under the Federal Lands Recreation Enhancement Act (REA) and the Forest Service's Interim Implementation Guidelines on REA are met.

4) Remove standard amenity recreation fee signs at all locations where standard amenity recreation fees for areas will not be enforced.

5) For large areas where fee enforcement will change, post a notice at the entrances to those areas and at recreation sites within those areas that indicates where recreation fees will and will not be enforced (see sample notice).

AR 501 (emphasis added).

But, it was not until July 5, 2012 that the Pacific Southwest Regional Office directed Sequoia National Forest to "immediately" manage the Lake Isabella SAFA as three stand-alone EAFAs. AR 507-510. Therefore, the Court will consider the informal conversion of the Lake Isabella sites to have taken place on July 5, 2015.

Yet, this begs the question of whether this informal conversion was lawful. The Forest Service insists that the informal re-designation was sufficient to alter the status of the Lake Isabella sites from a SAFA to three EAFAs for purposes of REA, pointing to the Deputy Chief's guidance that the Forest Service may "convert a standard amenity recreation fee for an area to another type of recreation fee, such as an expanded amenity recreation fee or special recreation permit fee, provided there is no change in the fee amount and the criteria for charging that type of fee under REA and the Forest Service's Interim Implementation Guidelines on REA are met." AR 499. Such policy guidance documents are entitled to *Skidmore* deference. *See Christensen,* 529 U.S. at 587 ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore....*"). As mentioned above, such a document is entitled to respect to the extent that it has the "power to persuade." *Id.* "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134,

140 (1944).

Plaintiff maintains that the informal conversion violated REA because public involvement is required before implementing such a change. *See* Doc. 33 at 14. In support of this argument, Plaintiff sites 16 U.S.C. § 6803, which provides, in pertinent part:

> (a) In general
>
> As required in this section, the Secretary shall provide the public with opportunities to participate in the <u>development of or changing of</u> a recreation fee established under this chapter.
>
> (b) Advance notice
>
> The Secretary shall publish a notice in the Federal Register of the establishment of a new recreation fee area for each agency 6 months before establishment. The Secretary shall publish notice of a new recreation fee <u>or a change to an existing recreation</u> fee established under this chapter in local newspapers and publications located near the site at which the recreation fee would be established or changed.

Plaintiff asserts that the conversion of a SAFA to an EAFA is a "change" requiring RRAC review.[13]

The key question is whether the Forest Service's interpretation of this statutory language, as set forth in the May 2012 Guidance, has the "power to persuade." Essentially, the Forest Service's position is that because the fee charged did not "change" and the requirements of REA applicable to EAFAs were met, public participation was not required prior to the conversion of the Lake Isabella SAFA to an EAFA. While the May 11, 2012 Guidance document does not provide explicit reasoning to justify its interpretation of REA, it does nevertheless present a reasonable interpretation of the statutory language. Subsections (a) and (b) of 16 U.S.C. § 6803 use the word "change" to trigger the requirement of public participation. REA does not define the word "change," so the court must give the term its ordinary meaning. *Milner*, 131 S. Ct. at 1264. Websters defines "change" to mean: "to become different: to make (someone or something) different: to become something else." http://www.merriam-webster.com/dictionary/change (last visited April 8, 2014). In the statutory text, this term modifies the terms "recreation fee" or "existing recreation fee." It is not unreasonable to interpret this language to

---

[13]     It is undisputed that the RRAC did not complete a review of the Lake Isabella sites until September 2013. AR 767.

mean that the fee itself must change for RRAC pre-approval to be required.[14]

Having found the informal conversion to be lawful, the Court declines to address the extended, arguments in the parties' briefs (including the entirety of the sur-reply and response) concerning the effectiveness of the RRAC's September 2013 formal approval of the changed designation.

The Court's conclusion regarding the informal conversion is also fatal to Plaintiff's claims regarding application of REA to the Lake Isabella SAFA, because the informal conversion in July 2012 took place before Plaintiff claims to ever have been harmed at the Lake Isabella SAFA sites.[15] While, Plaintiff claims to have received a Notice of Required Fee at one of the Lower Kern River sites on June 30, 2013, *see* Second Wiechers Decl., Doc. 25-3 at ¶¶ 4-6, he does not claim to have visited the Lake Isabella sites until January 2013, *see id.* at ¶¶ 15-26, by which time the informal conversion of the Lake Isabella sites to EAFAs had clearly taken place. Therefore, he does not have standing to pursue a challenge based upon the imposition of fees at the Lake Isabella sites prior to January 2013. It is not sufficient that he professed a vague "hesitat[ion] to visit" the fee areas on Lake Isabella subsequent to his receipt of the Notice of Required Fee in June 2012. *See Summers v. Earth Island Inst.,* 555 U.S. 488,

---

[14]     The Court is not persuaded by Plaintiff's reference to 16 U.S.C. § 6803(d)(2), which explains that the duties of RRAC's include the following:

> ...[A] Recreation Resource Advisory Committee may make recommendations to the Secretary regarding a standard amenity recreation fee or an expanded amenity recreation fee, whenever the recommendations relate to public concerns in the State or region covered by the Committee regarding—
>
> (A) the implementation of a standard amenity recreation fee or an expanded amenity recreation fee or the establishment of a specific recreation fee site;
>
> (B) the elimination of a standard amenity recreation fee or an expanded amenity recreation fee; or
>
> (C) the expansion or limitation of the recreation fee program.

The conversion of the Lake Isabella SAFA arguably resulted in the "limitation" of that fee program insofar as the geographic boundaries within which fees would be charged was thereafter limited to those areas included in the three, smaller EAFAs. However, the fact that the statute authorizes a RRAC to make recommendations on such issues does not alter the plain meaning of subsections (a) and (b), which control when public participation is required prior to taking action under the REA. This distinction is reflected in the Forest Service's guidance contained within the AR. In reference to the fact that "many lower developed recreation sites [were] proposed for elimination from the recreation fee program," the Deputy Chief of the National Forest System acknowledged that public participation is required by REA to implement such changes.  AR 499. However, where there is "no change in the fee amount and the criteria for charging that type of fee" are met, a Forest may convert a SAFA to another type of recreation fee. *Id.* This is a reasonable and persuasive interpretation of the statutory language.

[15]     This also makes it unnecessary to address Federal Defendant's alternative argument that the informal re-designation of the Lake Isabella SAFA into three EAFAs moots plaintiff's claims.

495 (2009) (plaintiff cannot establish standing based upon future visits to an impacted area unless he demonstrates specific plans to visit locations impacted by allegedly unlawful activity). Moreover, any challenge to the imposition of fees after January 2013 would have to be based upon the Forest Service's failure to provide the amenities required of EAFAs. Because it is undisputed that the sites satisfied the standards for EAFAs, Plaintiff's claim must fail.[16] Plaintiff's motion for summary judgment that charging him fees at the Lake Isabella sites violated REA is DENIED; Federal Defendant's cross motion is GRANTED.

### 4.    <u>Charging Visitors Who Do Not Use the Developed Amenities.</u>

REA specifically limits the Forest Service's ability to charge fees in SAFAs or EAFAs by, among other things, providing that the Forest Service "shall not charge any standard amenity recreation fee or expanded amenity recreation fee ... (A) [s]olely for parking, undesignated parking, or picnicking along roads or trailsides[;] (B) [f]or general access unless specifically authorized under this section[;] ... [or] (D) [f]or persons who are driving through, walking through, boating through, horseback riding through, or hiking through Federal recreational lands and waters without using the facilities and services...." 16 U.S.C.A. § 6802(d); *see also* 16 U.S.C. § 6802(f)-(g) (applying these limitations to SAFAs and EAFAs).

The Ninth Circuit addressed the limitations set forth in § 6802(d) in *Adams v. U.S. Forest Service*, 671 F.3d 1138 (9th Cir. 2012). There, recreational visitors to the Coronodo National Forest challenged the Forest Service's collection of fees from all drivers who park their vehicles in a mile-wide, 28-mile long piece of Catalina highway, the only paved road to the summit of Mount Lemmon, near Tucson, Arizona. *Id*. at 1139-40. The area in which the fees were charged was designated a HIRA under the Guidelines, a designation that requires the presence of the specific SAFA amenities discussed

---

[16]    Plaintiff cannot now argue that the sites fail to satisfy the standards for an EAFA, as no such claim is contained within the Complaint. As mentioned above, the First Claim for Relief specifically alleges that the Forest Service acted unlawfully by charging fees at the challenged sites without providing all of the six required amenities listed in 16 U.S.C. § 6802(f). Doc. 1 at ¶¶ 36-37. The Second Claim for Relief alleges generally that the Forest Service acted unlawfully by charging those fees of visitors, "regardless of whether they use the developed facilities and services." *Id*. at ¶¶ 38-39.

above, as well as certain additional requirements, such as:

> [A] clearly delineated, contiguous area with specific, tightly defined boundaries and clearly defined access points (such that visitors can easily identify the fee area boundaries on the ground or on a map/sign); that supports or sustains concentrated recreation use; and that provides opportunities for outdoor recreation that are directly associated with a natural or cultural feature, place, or activity (i.e., waterway, canyon, travel corridor, geographic attraction - the recreation attraction).

*Id*. at 1141; *see also* AR 70. At the Mt. Lemmon HIRA, the Forest Service chose to exempt all visitors who entered the area without a car, but did not exempt visitors who drove into the area, parked their cars, then picnicked, camped, or hiked in undeveloped areas accessible from the highway. *Id*. at 1142. Any such visitor who failed to pay the required fee was subject to a fine. *Id*. The district court granted the Forest Service's motion to dismiss, finding that the Forest Service's interpretation of the Guidelines as applied to the site was reasonable. *Id*.

The Ninth Circuit reversed, finding that the "REA unambiguously prohibits the standard amenity recreation fee structure in place at [the site]." *Id*. at 1143.

> Subsection (d)(1) is a freestanding prohibition on collecting standard and expanded amenity recreation fees "for" a list of eleven activities or services. This list of prohibited fees includes those that are: "[s]olely for parking, undesignated parking, or picnicking along roads or trailsides"; "[f]or persons who are driving through, walking through, boating through, horseback riding through, or hiking through Federal recreational lands and waters without using the facilities and services...." 16 U.S.C. § 6802(d)(1)(A), (D), & (E). The statute is abundantly clear that a standard amenity recreation fee cannot, under any circumstances, be charged for those activities.
>
> The Forest Service is prohibited from charging an amenity fee "[s]olely for parking." 16 U.S.C. § 6802(d)(1)(A). There is nothing ambiguous about that text. If all a visitor does is park, and he is charged a fee, that fee is imposed "[s]olely for parking." If a visitor parks at Mount Lemmon, he is charged a fee. If a visitor goes to Mount Lemmon but does not park there, he is not charged a fee. [Citation omitted] It may often be the case that a visitor, after parking, does something else. Then the fee would not be "[s]olely for parking," and so long as the "something else" is not another activity for which subsection (d)(1) prohibits an amenity recreation fee, the agency is free to charge him. But if a visitor does nothing other than park, the fee is solely for parking and is therefore plainly prohibited by the REA.

*Id*. at 1143-44. The Ninth Circuit explicitly rejected the proposition that a fee is "[s]olely for parking"

only "where the other amenities required by REA are absent." *Id*. at 1144.

> That is incorrect. If it were true, a "[s]olely for parking" fee would be possible only in places where the REA requires amenities, but then the parking fee prohibition would never limit fees in those places, where by definition amenities are present. And subsection (d)(1)(A) would never apply to expanded amenity recreation fees, because those are permitted only for certain "facilities and services." 16 U.S.C. § 6802(g)(2). "[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear," *MCI Telecomms. Corp. v. Am. Tel. and Tel. Co.*, 512 U.S. 218, 229 (1994), and here, the Forest Service's interpretation so diminishes the entire prohibition on fees "[s]olely for parking" as to defy the statute's meaning.

*Id*.

> Critically, the Ninth Circuit reasoned: "REA clearly contemplates that individuals can go to a place offering facilities and services without using the facilities and services and without paying a fee." *Id*.

> For example, subsection (d)(1)(D) prohibits fees "for persons who are driving through, walking through, boating through, horseback riding through, or hiking through ... without using the facilities and services." 16 U.S.C. § 6802(d)(1)(D) (emphasis added). The statute thus distinguishes between merely recreating in an area and actually using an area's amenities.

*Id*. at 1144-45.

Here, Plaintiff asserts that he uses the sites at issue in this case solely to access nearby natural features and therefore should not be subject to fee collection at any of the sites. Doc. 25-2 at 25. He specifically points out that there are no places to park at these sites that are dedicated to those users who solely wish to access these natural features without using any of the available amenities. It is Plaintiff's position that, under *Adams*, the Forest Service may not charge recreation fees for parking at developed recreation sites, so long as the visitor only parks at the site and intends to recreate only in nearby, undeveloped areas.,

The Forest Service attempts to distinguish *Adams* on several grounds.  First, the Forest Service points out, correctly, that *Adams* was decided on a motion to dismiss, which required that the court

assume the truth of all facts asserted in the complaint. *Adams,* 671 F.3d at 1142-43; Fed. R. Civ. P.

12(b)(6). Relatedly, the Forest Service points out that the facts of *Adams* are unique insofar as that case

concerned fees charged for parking anywhere within a 28 mile long, mile-wide stretch of highway. *Id.* at

1139. Here, by contrast, the challenged fee areas along the Lower Kern River are significantly smaller,

encompassing between five and ten acres. *See* AR 686 (Kern River sites map). The Forest Service

argues that because the amenities are located in close proximity to the parking areas, if a member of the

public visits the sites, one can assume that the visitor is using the amenities present there. Doc. 37 at 11.

Finally, and most persuasively, the Forest Service argues that *Adams* is distinguishable because

16 U.S.C. § 6802(d)(1)(A) prohibits a series of activities, each of which is modified by the prepositional

phrase "along roads or trailsides." In other words, because 16 U.S.C. § 6802(d)(1)(A) prohibits the

Secretary from charging any standard amenity recreation fee "[s]olely for parking, undesignated

parking, or picnicking along roads or trailsides," the prohibition only applies to fees charged: (1) solely

for parking along roads or trailsides; (2) solely for undesignated parking along roads or trailsides; or (3)

solely for picnicking along roads or trailsides." The Forest Service is correct that Plaintiff has failed to

make any allegation that would support a finding that he has been or is being charged solely for parking

or picnicking along a road or trailside. Doc. 37 at 11-12.

Plaintiff concedes that each clause of 16 U.S.C. § 6802(d)(1)(A) is limited by the "along roads or

trailsides" language. Doc. 33 at 20-21. In his opposition/reply, Plaintiff abandons his reliance on that

statutory provision and instead turning to subsection (d)(1)(D), which prohibits the imposition of fees

"[f]or persons who are driving through, walking through, boating through, horseback riding through, or

hiking through Federal recreational lands and waters without using the facilities and services." Plaintiff

points to the following language from *Adams*, where the Ninth Circuit reasoned:

> REA clearly contemplates that individuals can go to a place offering
> facilities and services without using the facilities and services and without
> paying a fee. For example, subsection (d)(1)(D) prohibits fees "for persons
> who are driving through, walking through, boating through, horseback
> riding through, or hiking through ... without using the facilities and
> services." 16 U.S.C. § 6802(d)(1)(D) []. The statute thus distinguishes

between merely recreating in an area and actually using an area's amenities.

*Adams*, 671 F.3d at 1144-45. But, Plaintiff fails to consider this reasoning in context. There, the Ninth Circuit was addressing the hypothetical argument that at Mt. Lemmon the Forest Service might not be imposing a fee "solely for parking" because it is possible that a parker might proceed to use other facilities. *Id*. at 1144. Rejecting this argument, the Ninth Circuit offered an elaborate analogy:

> Because "for" is, of course, not defined in the statute, we must give it "its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993) (citation omitted). This might seem like an impossible task— according to Webster's, "for" has over thirty non-obsolete meanings. Webster's Third New International Dictionary 886 (2002). "Ambiguity," however, "is a creature not of definitional possibilities but of statutory context." Brown v. Gardner, 513 U.S. 115, 118 (1994). And the statutory context here—a "[p]rohibition on fees for certain activities or services"— allows only one definition. 16 U.S.C. § 6802(d)(1). In common understanding, a buyer pays a fee "for" something he chooses to buy, even if that "something" is simply an option to do or use something (like $17.99 "for" an all-you-can-eat buffet). Consider what would happen if a restaurant-goer inspected his bill and noticed an unexpected charge. If told that the fee was for ten bottles of wine that the patron's group neither ordered nor drank, the patron would rightly be outraged. He would not find much solace in a waiter's explanation that the wine cellar contained ten bottles, which the patron could have ordered if he wished.

*Id*. Only then did the Ninth Circuit offer the language of 16 U.S.C. § 6802(d)(1)(D) as further support for its conclusion that the prohibitions of 16 U.S.C. § 6802(d) nevertheless apply even where a user might use available developed amenities. In the case of 16 U.S.C. § 6802(d)(1)(D), applicable to "persons who are driving through, walking through, boating through, horseback riding through, or hiking through," the statute is explicit that fees may not be charged if those users do not use the facilities and services. The quoted portion of *Adams* stands for the proposition that, in the case of 16 U.S.C. § 6802(d)(1)(A), prohibiting the imposition of fees upon visitors "[s]olely for parking, undesignated parking, or picnicking along roads or trailsides," the statute likewise prohibits the imposition of fees even if it is possible that such users might use developed amenities.

The problem for Plaintiff here is that neither provision applies to him. He admits 16 U.S.C. § 6802(d)(1)(A) does not apply because this case does not involve parking alongside a road or trailside.

41

Likewise, 16 U.S.C. § 6802(d)(1)(D) does not apply because he Plaintiff's interaction with the sites in question went beyond "driving through, walking through, boating through, horseback riding through, or hiking through" the area. He admits that he entered the SAFAs on the Lower Kern River and parked there. In imposing a fee upon Plaintiff under such circumstances, the Forest Service properly avoided running afoul of either prohibition.

Finally, Plaintiff's interpretation of *Adams* would totally eviscerate the fee program REA was designed to implement. The Forest Service is correct that under Plaintiff's interpretation, it would be forced either to use an honor system for fee collection, or maintain a heavy enforcement presence throughout each fee area to determine whether non-payors are in fact using the facilities and services provided. In construing a statute, the court must interpret the statute as a whole and not interpret a provision in a manner that renders another provision of the statute "inconsistent, meaningless, or superfluous." *Boise Cascade Corp. v. United States Envtl. Prot. Agency*, 942 F.2d 1427, 1432 (9th Cir. 1991). REA specifically authorizes the Forest Service to require display of a recreation pass on a vehicle, rather than having to patrol each fee area, ask for proof of payment, and personally cite each violator. 16 U.S.C. § 6811(b).

To the extent Plaintiff argues that REA and *Adams* require the Forest Service to provide free alternate parking for visitors who do not intend to use the amenities at developed recreation sites, Doc. 25-2 at 25, the Court agrees with the Forest Service that any such argument lacks merit. Nothing in REA or *Adams* requires the Agency to provide free alternate parking, and Plaintiff has not pointed to any such requirement. REA does prohibit the imposition of fees upon visitors under certain circumstances, none of which apply to the facts of this case.

## 5.     Additional Agency Actions.

The Court has expended inordinate amounts of time imposing some structure upon the parties' somewhat jumbled arguments. One straggling issue merits some additional attention. In his opposition, Plaintiff asserts that he is also challenging agency actions in the form of licenses, permits and sanctions

imposed upon him. Doc. 33 at 7. Specifically, he asserts that the Forest Service has taken distinct final agency action against him by issuing Plaintiff various recreation permits, licenses, or sanctions under the authority of REA, which "take the form of the Southern Sierra Pass or other passes that must be displayed on a vehicle after purchase to use a recreation fee site." *Id*.

The APA applies only to "[s]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The APA defines reviewable "agency action" to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Although the Court has been unable to locate any analogous cases addressing whether the issuance of a recreation pass would constitute "final agency action" under the APA, "courts have long recognized that the term 'agency action' is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800-01 (9th Cir. 2013). "Final agency actions" are actions (1) which "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). It is not necessary, however, for the Court to resolve this underdeveloped issue here, because even if the sale of a recreation pass (or even the issuance of a Notice of Required Fee) constitutes "final agency action" for purposes of the APA, consideration of any such additional agency actions changes nothing in this case from a practical perspective. The lawfulness of the Forest Service requiring Plaintiff to pay any fee turns on whether or not the Forest Service properly imposed fees upon users recreating at the challenged fee areas. Those issues have been thoroughly addressed above.

**E.      Relief.**

The Court has ruled in favor of Plaintiff on one merits issue. The Forest Service improperly charged recreation fees at the Miracle site, which did not and does not offer a permanent toilet facility. The Forest Service argues that another round of briefing should ensue regarding the appropriate relief to

ensure that the relief is narrowly tailored. Doc. 30-1 at 23-24. Plaintiff maintains there is no reason for further proceedings because, under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " 5 U.S.C. § 706. "Typically, when an agency violates the Administrative Procedure Act ... [a court should] vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Defenders of Wildlife v. U.S. Environmental Protection Agency*, 420 F.3d 946, 978 (9th Cir. 2005), rev'd on other grounds, *Nat'l Ass'n of Home Builders v. Defenders of Wildife*, 549 U.S. 1105 (2007).

Here, there is no question that Plaintiff is entitled to reimbursement of the fees he expended to access the Miracle site. The Court trusts that the parties can formulate an appropriate stipulated judgment that calculates an appropriate amount of reimbursement. In the alternative, an amount can be determined and paid, making further discussion moot.

As to any additional injunctive or declaratory relief, including vacatur, the Court is at a loss as to how the Forest Service could act in compliance with its statutory obligations without suspending fee collection at the Miracle site, at least in the interim period until new toilet facilities can be constructed, if that is what the Forest Service plans to do. Nor can the court envision any more "narrowly tailored" remedy. Yet, the Court likewise cannot see the harm in affording the Forest Service a brief amount of time to propose an appropriate form of judgment to the Court.

//

//

//

//

//

//

//

//

Accordingly, the parties are directed to meet and confer regarding the scope of a judgment in this case. To the extent the parties cannot agree, they shall so indicate in a joint proposal. To the extent they cannot agree, the parties may include separate proposals along with brief supporting legal citations. Any such proposals shall be merged into a single document that shall be filed with the Court on or before May 9, 2014. Cooperation among the parties is expected by the Court, and a lack of cooperation to prepare and submit this document will be dealt with severely

## V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) The Forest Service's motion to strike is GRANTED IN PART AND DENIED IN PART:

    (a)    It is GRANTED as to evidence pertaining to standing and as to the consideration of Exhibits A-E to the Second Wiechers Declaration for the sole purpose of establishing the availability of a judicial remedy;

    (b)    The motion is DENIED as to all other evidence for all other purposes;

(2) Plaintiff's motion for summary judgment is GRANTED IN PART AND DENIED IN PART and Federal Defendant's cross motion is GRANTED IN PART AND DENIED IN PART:

    (a)    Plaintiff's motion is GRANTED and Federal Defendant's cross motion is DENIED as to Plaintiff's contention that the toilet facilities at the Miracle SAFA site are not "permanent toilet facilities" under REA;

    (b) Plaintiff's motion is DENIED and Federal Defendant's cross motion is GRANTED as to all other arguments and claims; and

(3) The Parties are instructed to file joint proposed form of judgment in compliance with the above instructions on or before May 9, 1014.

**IT IS SO ORDERED.**

    Dated:   <u>  **April 9, 2014**  </u>           <u>  **/s/ Lawrence J. O'Neill**  </u>
                                                **UNITED STATES DISTRICT JUDGE**